In re: Condemnation by Sunoco      :
Pipeline L.P. of Permanent and      :
Temporary Rights of Way for the      :
Transportation of Ethane, Propane,      :
Liquid Petroleum Gas, and other      :
Petroleum Products in East Goshen      :
Township, Chester County      :
Pennsylvania, over the Lands of      :
Hershey's Mill Homeowners      :
Association      :
     :
Appeal of: Hershey's Mill      :    No. 1003 C.D. 2023
Homeowners Association      :    Argued: June 4, 2024

BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge (P.)
           HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                            FILED: July 3, 2024

        Hershey's Mill Homeowners Association (Condemnee) appeals from the Chester County Common Pleas Court's (trial court) August 4, 2023 order that granted Sunoco Pipeline L.P.'s (Sunoco) motion for release and termination of the original bond for damages (Motion). Condemnee raises two issues for this Court's review: (1) whether the trial court erred by granting the Motion on the basis that Condemnee had not timely filed a petition for appointment of viewers for the assessment of damages; and (2) whether Sunoco engaged in misleading and deceptive conduct to justify tolling the statute of limitations. After review, this Court vacates and remands.

On May 17, 2016, Sunoco filed a Declaration of Taking (Declaration) for its Mariner East 2 Pipeline project. The Declaration related to the acquisition of permanent and temporary rights of way over Condemnee's property. Sunoco also acquired temporary and permanent easements with respect to two adjoining properties – one owned by Village of Quaker Homeowners Association (VQHA) and one owned by Hershey's Mill Commercial Holdings, LLC (HMCH). Sunoco attached a copy of a $3,000.00 bond to the Declaration (Bond) as security for all damages arising from the appropriation of Sunoco's interest in Condemnee's property. Sunoco offered Condemnee the full amount of estimated just compensation, but Condemnee refused the offer. On September 12, 2016, Sunoco petitioned to deposit with the trial court its estimated just compensation and on October 19, 2016, pursuant to the trial court's order, deposited $3,000.00 with the trial court prothonotary representing Sunoco's just compensation estimate. Condemnee did not petition for fund disbursement. On July 12, 2023, Sunoco moved to release and terminate the original bond and discontinue the action. Condemnee filed an answer in opposition (Answer in Opposition) on August 4, 2023. On the same day, the trial court granted Sunoco the requested relief. On August 31, 2023, Condemnee filed for reconsideration, which the trial court denied.[1] On September 5, 2023, Condemnee appealed to this Court.

On September 11, 2023, the trial court ordered Condemnee to file a Statement of Errors Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 1925(b) (Statement of Errors). On October 2, 2023, Condemnee filed its Statement of Errors. On October 12, 2023, the trial court issued its Opinion pursuant to Rule 1925(a) (Rule 1925(a) Opinion).

---

[1] Although Condemnee appears to challenge the trial court's denial of its motion for reconsideration, orders denying reconsideration are not appealable. *See City of Phila. v. Rivera*, 171 A.3d 1 (Pa. Cmwlth. 2017).

According to Condemnee's Answer in Opposition:[2]

Sunoco planned to install two underground pipelines on and along the properties of Condemnee and [V]QH[]A and HMCH ([]Project[]).  Throughout this Project, Sunoco[], through its counsel, George Kroculick, Esquire [(Kroculick),] and Sunoco personnel and contractors, treated the Project, including site acquisition and easements, site preparation, installation and restoration, as well as compensation to [Condemnee] as one continuing operation.  The two pipelines were installed in a west to east sequence along Boot Road.  By agreement with Sunoco [], to facilitate settlement of claims, coordinate scheduling, minimize impact on the Hershey's Mill community and to avoid litigation cost and delay, Condemnee, [V]QH[]A and HMCH did not challenge the condemnations, nor the bonds, nor seek to litigate damages because Sunoco [] **provided assurances that agreement would be reached on all outstanding matters**, either during the Project or **upon conclusion of the same**.  Consistent with this agreement, **Sunoco [] agreed to and did in fact resolve all issues involving the Project and HMCH but did so only at the conclusion of that phase of the Project, which lasted some five years. Because the [V]QH[]A and Condemnee's properties were situated to the east of HMCH, and further because staging for equipment to install pipeline running to the east toward Paoli Pike w[as] operated by Sunoco [] on their properties, Sunoco [] did not complete work there until after some six years of occupation, noise, vibration, interruption, [and] loss of community amenities, such as security walls and landscaping and trees and other construction conditions there**.  Installation plans and schedules constantly changed as Sunoco [] performed these installations.  Upon completion of Sunoco['s] work, entirely consistent with Sunoco['s] resolution of the

---

[2] Courts resolve all well-pled facts and inferences in favor of the **non-moving party**.  *See Property Owners, Residents, and/or Taxpayers of Pleasant Valley School Dist. v. Pleasant Valley School Dist.*, 515 A.2d 85, 90, (Pa. Cmwlth. 1986).

HMCH portion of the Project, in the summer of 2022, Condemnee and [V]QH[]A sought resolution of their outstanding claims. Kroculick advised that he had been replaced as counsel by a law firm in Lancaster. Upon request that the remaining Project matters then be resolved, counsel for Sunoco [] advised that Sunoco [] would no longer consider the claims of Condemnee.

The amounts sought by Condemnee are these: Easement Value - $57,100[.00], Trees Removed - $37,842[.00] and statutory legal fee reimbursement of $4,000[.00], which totals $98,942[.00]. Condemnee at all times acted in good faith and **in reliance upon the representation of Sunoco** [], **including Sunoco**[**'s**] **own conduct** in resolving the HMCH issues and reasonably expected that, after more than six years of occupying these properties so that it could finally complete the Project, Sunoco [] would honor its commitments to Condemnee.

Reproduced Record (R.R.) at 394a-395a (emphasis added).

Condemnee first asserts that the trial court erred by granting the Motion on the basis that Condemnee had not timely filed a petition for appointment of viewers for the assessment of damages, where Condemnee did not file because Sunoco's conduct was misleading and deceptive. Pursuant to Section 5527(a)(1)(i) of the Judicial Code, "[i]f a condemnor has filed a declaration of taking, a petition for the appointment of viewers for the assessment of damages . . . must be filed within six years from the date on which the condemnor first made payment in accordance with 26 Pa.C.S. § 307(a) or (b) [of the Eminent Domain Code] (relating to possession, right of entry and payment of compensation)." 42 Pa.C.S. § 5527(a)(1)(i); *see also In re Condemnation of Land at Rear of 700 Summit Ave. Jenkintown Pa.*, 95 A.3d 946 (Pa. Cmwlth. 2014).

With respect to statutes of limitation, this Court has observed:

In Pennsylvania, . . . generally, "[s]tatutes of limitation[] 'are designed to effectuate three purposes: (1) preservation of evidence; (2) the right of potential defendants to repose; and (3) administrative efficiency and convenience.'"

4

*Lesoon v. Metro. Life Ins. Co.*, . . . 898 A.2d 620, 626-27 ([Pa. Super.] 2006) (quoting *Kingston Coal Co. v. Felton Mining Co.*, . . . 690 A.2d 284, 288 ([Pa. Super.] 1987)). "Whether a complaint is timely filed within the limitations period is a matter of law for the court to determine." *Crouse v. Cyclops Indus.*, . . . 745 A.2d 606, 611 ([Pa.] 2000).

*Carulli v. N. Versailles Twp. Sanitary Auth.*, 216 A.3d 564, 577 (Pa. Cmwlth. 2019).

[Section 5504 of t]he Judicial Code provides:

> **(a) General rule**.--Except as provided in [S]ection 1722(c) [of the Judicial Code, 42 Pa.C.S. § 1722(c)] (relating to time limitations) or in subsection (b) of this section, the time limited by this chapter **shall not be extended by order**, **rule or otherwise**.
>
> **(b) Fraud**.--The time limited by this chapter may be extended to relieve fraud or its equivalent, but there shall be no extension of time as a matter of indulgence or with respect to any criminal proceeding.

42 Pa.C.S. § 5504 (emphasis added). This section expressly prohibits judicial extensions of the time to commence an action.

*Mariner Chestnut Partners, L.P. v. Lenfest*, 152 A.3d 265, 284 (Pa. Super. 2016).

Accordingly,

[o]nce the statute of limitations has run, the only way it may be tolled is if a party can be estopped from claiming the statute as a defense. *Dep*[*'t*] *of Transp*[.] *v. Dyberry Sand & Gravel, Inc.*, . . . 542 A.2d 650 ([Pa. Cmwlth.] 1988) . . . . Quoting from *Nesbitt v. Erie Coach Co*[.], . . . 204 A.2d 473, 475 ([Pa.] 1964), [this Court] stated in *Dyberry*:

> If through fraud or concealment the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry, the defendant is estopped from invoking the

5

> bar of limitation of action. The burden of proving the existence of such fraud or concealment is upon the asserting party by evidence that is clear, precise[,] and convincing. It is also well established that mere negotiations toward an amicable settlement afford no basis for an estoppel, *nor do mistakes, misunderstandings*[,] *or lack of knowledge in themselves toll the running of the statute. . . .*
>
> *Dyberry*, . . . 542 A.2d at 652 (citations omitted) (emphasis in original).[3]

*Davis v. Commonwealth*, 660 A.2d 157, 161 (Pa. Cmwlth. 1995); *see also Omnicare,*

*Inc. v. Dep't of Pub. Welfare*, 68 A.3d 20 (Pa. Cmwlth. 2013).

> [T]he "fraud or concealment" necessary to establish a case for application of estoppel principles to prevent a defendant from asserting a statute of limitations does not mean fraud or concealment in "the strictest sense encompassing an intent to deceive, **but rather fraud in the broadest sense which includes an unintentional deception** . . . (citation omitted). It is not the intention of the party estopped but the natural effect upon the other party which gives vitality to an estoppel." *Nesbitt . . .* 204 A.2d at 476-77 . . . .

---

[3] In *Dyberry*,

> [t]he Board [of Claims] made no finding of fraud or concealment but nevertheless concluded as a matter of law that, because [the contractor] had engaged in what the Board [of Claims] considered 'good faith' negotiations, [the Pennsylvania Department of Transportation (]DOT[)] was then estopped from claiming the statute of limitation as a defense.

*Id.* at 652. This Court reversed because "[t]he record show[ed] that [the contractor] had full knowledge and was fully aware that DOT did not intend to pay the full contract price nor did DOT intend to negotiate the matter any further." *Id.*

*Dep't of Pub. Welfare v. UEC, Inc.*, 397 A.2d 779, 784 (Pa. 1979) (emphasis added);

*see also Del-Car Auto., Ltd. v. Pa. State Police*, 624 A.2d 262 (Pa. Cmwlth. 1993).[4]

In *UEC*, this Court held:

The facts pleaded in UEC's complaint are clearly sufficient to demonstrate the propriety of applying estoppel to prevent the Commonwealth from asserting the bar of the six-month limitation of 72 P.S. § 4651-6[5]. High Commonwealth officials, including the Secretary of

---

[4] In *Del-Car*, towing company petitioners (Companies) appealed from a Board of Claims' determination that their claim for services were time barred. This Court affirmed, explaining:

[Companies] assert[] that the aggregate of [the Pennsylvania State Police's (PSP)] conduct was sufficient to invoke estoppel. Specifically, [Companies] cite[] alleged discussions with PSP regarding the existence of a fund from which [Companies] would be compensated; PSP's institution of a legal action to prevent [Companies] from disposing of certain property and thus forcing [Companies] to continue [their] storage for an additional two years; and alleged conversations with PSP in which PSP indicated a willingness to resolve all outstanding claims for towing and storage fees.

[This Court is] satisfied, however, that this is not a situation where PSP intentionally misled [Companies] or misrepresented the status of [their] claim. In fact, the record is replete with testimony from officers of PSP that no representations were ever made that PSP would compensate [Companies] for [their] services. As early as 1982, PSP denied responsibility for payment of the subject towing and storage charges. [This Court] find[s] that there simply was nothing in PSP's conduct to suggest the "fraud or concealment" necessary to support the application of the doctrine of estoppel as this court previously has required under other circumstances. Therefore, [this Court] agree[s] with the Board [of Claims] that PSP was not estopped from asserting the statute of limitations as a defense.

*Del-Car*, 624 A.2d at 265 (footnotes and citations omitted).

[5] Section 6 of the Board of Claims Act, Act of May 20, 1937, P.L. 728, *as amended*, *formerly* 72 P.S. § 4651-6. The Board of Claims Act was repealed by the Act of December 3, 2002, P.L. 1147, and reenacted as part of Title 62 of Pennsylvania's Consolidated Statutes, effective June 28, 2003.

[Public Welfare[6]] and its General Counsel, repeatedly gave UEC their assurances that the Commonwealth would compensate them [sic] (UEC) under the contract. In fact, they made partial payment and merely questioned the remainder owed.

*UEC*, 397 A.2d at 784.

The Pennsylvania Supreme Court's decision in *Nesbitt* is instructive. In *Nesbitt*, the plaintiff sought damages for injuries she sustained in a motor vehicle accident while a passenger on the defendant's bus. The defendant moved for summary judgment alleging that the action was time barred. In response, the plaintiff claimed that because the defendant's agents' conduct induced her delay in bringing the action, the defendant was estopped from claiming protection of the statute of limitations. Describing the facts in the light most favorable to the plaintiff, the *Nesbitt* Court stated:

Following the accident, the plaintiff promptly notified the defendant of her injury and, as a result, an insurance adjuster contacted her within a few days and secured a written statement describing the occurrence. From July 17, 1959, until July 6, 1961, three different insurance adjusters, acting on behalf of the defendant, called upon the plaintiff personally or contacted her by phone many, many times inquiring of her health, physical progress, and possibilities of settlement. That the plaintiff imposed great confidence and trust in these individuals throughout is clear. As early as June 25, 1960, **a sum was suggested in settlement which was refused because**, **as of that date**, **the extent of the injuries was undetermined**. On the same occasion, **she was informed not to worry about her claim because the case would be continued by the adjustment agency in her best interests**.

Having failed to respond satisfactorily to medical treatment, the plaintiff was hospitalized from March 9 to May 4, 1961, and surgery was performed. During this period, one of the insurance adjusters involved visited her. Before this visit, he was informed by his employer that, in

---

[6] The Department of Public Welfare is now called the Department of Human Services.

8

his employer's opinion, no liability existed, and was instructed to offer a small sum as a nuisance settlement. He made no offer, did not inform the plaintiff of the insurance carrier's position as to liability, and, on the contrary, told her that it would be impossible to settle the case at that time because the extent of the injuries was not known.

On June 1, 1961, the plaintiff forwarded a letter to the same adjuster inquiring about the possibility of an interim payment to take care of her pressing financial problems, and also the advisability of retaining the services of an attorney. On June 11, 1961, she was visited by this adjuster. He told her, *inter alia*, that the defendant would have to pay her hospital and doctor bills because of its responsibility for her injury; "why hire an attorney and pay him when we haven't refused you yet"; that the case was still open and active; that he would write to the home office and ask if interim payments were possible and asked, "Do you mind waiting a little while longer for an answer?"; [and] that he (the adjuster) was getting married, but not to worry and he would see her again on his return.

The same adjuster visited the plaintiff again on July 6, 1961, five days before the expiration of the statute. **He informed her that the carrier was not empowered to make interim payments**; **that only one check could be issued** *when all of the facts were in* **and the case was settled to their mutual satisfaction**; **and that the plaintiff would be cheating herself if she agreed to settle before the full extent of the injuries was known**. Again[,] he concealed the fact that the carrier considered the case one of nonliability. Admittedly, he did not mention the statute of limitations because before this visit he had discussed this point with a superior and was specifically instructed not to do so. He inquired of and noted the additional expenses that had been incurred. Upon leaving, he said that he would see her again and that she should phone him if anything turned up.

The plaintiff was never contacted again.

*Nesbitt*, 204 A.2d at 475-76 (bold emphasis added). The *Nesbitt* Court concluded:

> If the above facts are true, and in our opinion this question has not yet been determined, the circumstances could reasonably lead to the conclusion that the conduct of the defendant's agents caused the plaintiff to unduly relax her vigilance and delay institution of the present action to a time beyond the statutory limitation period. This would give rise to an estoppel [claim].

*Id*. at 476 (footnote omitted).

Here, according to the trial court, it did not conduct a hearing on the Motion because "all the facts necessary to determine the application of the statute of limitations were set forth in the [M]otion and admitted in the [A]nswer [in Opposition]." R.R. at 452a. The trial court did not identify the particular facts upon which it relied in reaching that conclusion.

Based on *Nesbitt*, this Court must consider whether, in its response to Sunoco's Motion, Condemnee averred facts which, when viewed in the light most favorable to Condemnee, could establish that Sunoco's conduct "cause[d] the [Condemnee] to relax [its] vigilance or deviate from [its] right of inquiry[.]" *Nesbitt*, 204 A.2d at 475; *see also* R.R. at 393a-395a. In its Answer in Opposition, Condemnee alleged that "Sunoco [] provided assurances that agreement would be reached on all outstanding matters, either during the Project or **upon conclusion of the same**." R.R. at 394a (emphasis added). Condemnee further averred that Sunoco "did in fact resolve all issues involving the Project and HMCH[,] but did so only at the conclusion of that phase of the Project, which lasted some five years." *Id*. Condemnee also asserted in its Answer in Opposition that Sunoco's conduct with respect to HMCH, along with Sunoco's assurances, led Condemnee to reasonably believe that Sunoco would similarly resolve the issues for the remaining projects at the projects' conclusion, however long that might take. These averred facts were buttressed by a March 29, 2023 letter (March 29 Letter) from Condemnee's counsel to Sunoco's counsel that Condemnee attached to its motion for reconsideration and

10

that the trial court referenced in its Rule 1925(a) Opinion. The trial court observed that "Condemnee's counsel acknowledges [therein that] there is no agreement, asking Sunoco to act in good faith to resolve 'these open matter[s.]'" R.R. at 452a. However, the March 29 Letter reflects more.

> The March 29 Letter states, in relevant part:
>
> In our communication, we provided what my clients wanted at that time, based on what Sunoco was telling us of their schedule then. **Sunoco agreed to certain points and reserved others to be negotiated <u>because schedule and actual installation plans were still not finalized</u>.** We had a series of meetings at HMCH with Sunoco's counsel and field personnel to try and close things out yet could not agree **until we knew the final scope and timing of the work to be done by Sunoco**, **both in installation and restoration at all three affected areas**. Specifically, **because pipeline installations by open cut or pulls took place at different times and in different places**, **the three work areas were not moving in simultaneous or linear sequence but rather piecemeal**. The HMCH piece separated off completely from the [V]QH[]A and [Condemnee] sections in negotiations in 2019 through October 2020. . . . **[W]e agreed to meet and resolve HM[CH] first and [Condemnee] and [V]QH[]A would follow**.

R.R. at 415a (emphasis added).

Condemnee's averments in its Answer in Opposition and the March 29 Letter's contents reflect that the parties had settled one of the three similar actions, agreeing to certain points with the understanding that others could not be negotiated until Project completion, and as had occurred with the first project, Sunoco would resolve Condemnee's and VQHA's claims as those projects reached completion because necessary information would become available to inform the amounts due. Thus, Sunoco's conduct was not simply settlement negotiations, but purportedly included assurances Sunoco made which could have induced Condemnee's delay.

11

If proven true, "the circumstances could reasonably lead to the conclusion that the conduct of [Sunoco]'s agents caused [Condemnee] to unduly relax [its] vigilance and delay institution of the present action to a time beyond the statutory limitation period." *Nesbitt*, 204 A.2d at 476. Accordingly, the trial court should have held an evidentiary hearing to take evidence of Condemnee's allegations to determine whether Sunoco's actions tolled the statute of limitations.

For all of the above reasons, the trial court's order is vacated, and the matter is remanded to the trial court to hold a hearing consistent with this Opinion.[7]

_____

ANNE E. COVEY, Judge

---

[7] Given this Court's disposition of the first issue, it does not reach the second.

12

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Condemnation by Sunoco : 
Pipeline L.P. of Permanent and : 
Temporary Rights of Way for the : 
Transportation of Ethane, Propane, : 
Liquid Petroleum Gas, and other : 
Petroleum Products in East Goshen : 
Township, Chester County : 
Pennsylvania, over the Lands of : 
Hershey's Mill Homeowners : 
Association : 
: 
Appeal of: Hershey's Mill : No. 1003 C.D. 2023
Homeowners Association : 

## O R D E R

AND NOW, this 3rd day of July, 2024, the Chester County Common Pleas Court's (trial court) August 4, 2023 order is VACATED, and the matter is REMANDED to the trial court for proceedings consistent with this opinion.

Jurisdiction relinquished.

_____
ANNE E. COVEY, Judge